All right, our next and last case for argument this morning is U.S. v. Sri Wijegoonaratna. If counsel could let Judge Nguyen know if she got that right, we have a little bet, so we'll see. Good morning, your honors. May it please the court. Alyssa Bell on behalf of Sri Wijegoonaratna. You won. For the purposes of argument, I had hoped and planned, with the court's permission, to refer to him as Dr. J, as it's his preference, and I'd like to reserve three minutes of my time for rebuttal. Your honors, I think the clearest cases of error and for reversal in this case are Rule 32 and the Ex Post Facto Clause, so I do plan to start there, unless the court has different questions. This court's precedent requires strict compliance with Rule 32. That means the court must resolve any factual disputes expressly and explicitly and cite evidence in the record as to why it has chosen one party's position over another. The clearest case for that is job. And here, Dr. J made a series of specific factual objections. The first of those was that he had not fraudulently certified the 131 patients who were at issue at sentencing, and of course, if some of those patients were hospice-eligible, that's not part of the fraud. There's no actus reus of a crime there. Second, he explained that a patient's survival at discharge was not an appropriate proxy. I'm sorry, that the survival at discharge was not an appropriate proxy for a fraudulent initial certification. So, in other words, in certifying a patient as hospice-eligible, he stated that person had six months to live. So if a person was alive at discharge at 90 days, that did not mean that he had fraudulently certified that person. And third, perhaps this is the most fact-bound, there were two periods of certification at issue, the initial certification for 90 days and then a recertification. The bulk of the trial evidence was that Dr. J was not responsible for the recertifications. It was Dr. Atiga who signed the recertifications. The government submitted a rebuttal to Dr. J's position paper addressing all of these factual objections with rebuttal facts and asking the court to draw inferences in its favor. For example, it pointed to Dr. J's participation in ongoing patient meetings and said, even if he wasn't signing a recertification, clearly he was involved. He should be held responsible for these patients. These were fact-bound issues, and the court was required to resolve these factual disputes. Instead, the court said, quote, I presided over trial, and when a judge presides over a trial, there's so much more information that comes to light. And then concluded, in this particular case, I'm convinced that the government has met its burden. That was not a resolution of a factual dispute. Well, at one point, the district court acknowledged your position with regard to loss, and it said, the court said, it appears that counsel's taking the position that loss should be limited only to the count's charge. And so then the court resolved that by saying, I heard the evidence, and I think the government sustained its burden. Is that not enough? No, Your Honor, it's not. And that's for two reasons. For one, that was not a fair statement of counsel's position. Counsel made a series of arguments that would have reduced the loss by certain amounts. One of those arguments was, the government has fallen so far short of meeting its burden here that it only makes sense to attribute losses to Dr. J that were proved at trial. However, Dr. J also had one argument for a 16% reduction in that loss amount, and that was because he stated that he should not be responsible for certifying at a better rate than the national average. The second was that he should not be responsible for any patient who died within Medicare's reasonable parameters. And I'd like to note for the court that the district court, in fact, seemed to credit and adopt that argument. The court said that it would, quote, accept that he, Dr. J, made a good-faith determination in those cases where, quote, patients died within reasonable parameters established by Medicare. The court was well aware that there was this factual dispute which required either a 16%, a 20%, or a 34% reduction depending on which reasonable parameter of Medicare, be it the national average, death within six months or death within two years. Was there a proposal of loss? Yes. And what was that? That would have resulted in how many levels enhancement under the defense theory of the case? It would have been an additional two levels off under either the first or second proposal, and I believe a four level off under the third proposal, although our papers do state that specifically. There was this separate specific factual issue, of course, of the recertifications. And the government at sentencing provided the district court with some sign-in sheets and stated, Dr. J was present for these ongoing patient reviews and I'm offering you approximately 30 sign-in sheets. Well, 30 sign-in sheets was not 131 sign-in sheets. So even if the district court had some evidence that Dr. J was responsible for recertifications, the court nonetheless held him responsible for recertifying all 131 patients. And this court's precedent does really require, the issue here really is twofold. First, under Job, a specific factual resolution of this dispute, not simply a statement that I was at the trial, I understand the evidence, I have reviewed it and I'm satisfied. That's almost exactly what the district judge did in Job. Do you want to go to your ex post facto clause argument? Yes. If I could just finish quickly. The second issue that this goes to is whether the losses were properly determined in the first instance. And our argument is that there was clear error here. And I would point the court to Zalp for this proposition that even in a case where there may be evidence where the court could draw an inference that Dr. J was responsible for some large portion of those 131 patients, it was clear error for the court not to really go into the messy calculation business of how many patients were really fraudulently certified here. First, the court made the statement that it would accept his good faith determination, but then made zero reductions. So it appears not to have followed its own methodology and therefore to have come to an unreasonable conclusion. And in the Zalp case, it was a pump and dump scheme. The government claimed the stock was clearly mostly worthless. And the court said, well, mostly worthless means it retains some value. And the court was required to get into the messy details of what value the stock retained. Well, here, the court was required to get into the messy details of how many of those 131 patients should Dr. J really be responsible for having fraudulently certified. And it was clear error not to have done so. Moving to the ex post facto issue, thank you, Your Honor. I would like to clarify at the outset. The court here never mentioned, let alone calculated, two separate guidelines range, one of which applied to six of seven counts. I think I was unclear in my papers on this point. The way the court sentenced here is it calculated one guidelines range, or it sentenced to 78 months on all accounts that were at issue, including count nine, which had this higher guidelines range. And then sentenced to an additional 30 months consecutive under section 3147 for the penalty for an offense committed while on release for what the court called the overall guidelines range and sentenced then at the low end of that range for 108 months. So there is no evidence, even though the government has tried to point to the record somehow, that the court in fact sentenced under two books. The court sentenced under one. But let's say I agree with you on that. And let's say I agree that technically speaking, the district court should have done exactly what you said. There, and I know you're in your brief, you do a very strenuous job of trying to argue it's not plain error review. But let's assume for a moment that it is plain error review. Can you explain the prejudice here, because as I understand it, the stat max for count nine is I think 20 years for 1347. So it's more than the sentence was here. If your client were convicted just of count nine, why does it matter that your client was not sentenced properly in other counts under plain error review? I think the clearest answer to that comes from the Supreme Court's recent pronouncement in Rosales-Morales, where the court said, even mine run guidelines error is plain error. And even if the court could sentence to the same, or the original sentence was within the guidelines range, or even if the court could sentence to more on remand, it still satisfies plain error, where the court makes a significant procedural error in failing to calculate the guidelines range correctly. But now, I mean, I think we agree that the court, I mean, you have other reasons why the guidelines may not have been calculated properly. But as to count nine, there is no ex post facto problem, correct? That is correct. So when the Supreme Court talks about plain error, has it ever talked about in this instance where for one of the counts, it's absolutely correct. For the other counts, it's wrong. It seems to be a little different. The majority in Rosales-Morales did not deal with that issue directly, but the dissent actually at 1915 did criticize the majority's holding for having this consequence in the ex post facto context, where errors that would seem to be harmless like this, because the same sentence could be imposed, in fact, would now be plain error under the majority's holding. So the dissent at least contemplated that this was the result of the majority's holding. And I would also, of course, point to Ortlin, where it says, the court, this court said, it is, even if the same punishment could be imposed, the rest of the counts could not be punished at that higher level. And so at the very least, there has to be a remand for that process. The JNC would need to be corrected almost, in a sense. Well, it would need to be remanded for the court to recalculate the guidelines at what I imagine would be somewhat of a plenary sentencing, as is the procedure. But Rosales-Morales was very clear to point out that it's a very minimal burden to remand under these circumstances. A jury doesn't have to be impaneled. There are no witnesses who have to be recalled. Because it is such a minimal burden, remand really is the appropriate course when there's a failure to calculate the guidelines range correctly. And I, does the court have any questions for me on the sentencing issues, or would the court prefer that I proceed to the prosecutorial misconduct issue? I don't have any questions. Judge Gould? No questions here. Okay. I see that I do have about a minute until I sit down. So I will briefly touch on that issue. I think the reason there was prosecutorial misconduct and error here is that the prosecutor relied on one set of outlier patient records to make a sweeping statement as to how this fraud scheme worked. The prosecutor stated that Dr. J was elevating a patient's diagnosis. Then a nurse saw the patient first, diagnosed something that was not hospice eligible and not reimbursable by Medicare, and then elevated that diagnosis. That in fact was not correct, and it was not how the fraud scheme that the government had charged quote-unquote worked. For six of seven patients, the nurse did an initial assessment, and patient intake at California Hospice reflected that initial. As I read the government's argument, it really is an inference drawn from the intake form for one particular patient where the terminal diagnosis and the weight match Dr. J's history and physical and not the nurse's assessment. I thought that's what the argument was all about. As to this one patient, the intake note was not consistent with the nurse's assessment. Instead, it corresponded exactly as Dr. J's history and physical indicated. Yes. How is that not a fair inference? It is absolutely a fair inference as to that one patient. The problem is that the inference the prosecutor asked the jury to draw was much more sweeping as to how the fraud scheme worked. He pointed to that patient as emblematic of how the fraud scheme worked as opposed to as an outlier. The fraud scheme plainly did not work that way for any of the other patients charged, nor for the other 131 patients who were then at issue at sentencing. The prosecutor really does have a higher burden here. His argument went to the heart of the defense case under the Reyes decision. That is particularly prejudicial. The government knew its evidence, it knew Castillo's testimony, it knew its documentary evidence. It simply was not at liberty to point to this one patient and to say, this is how it worked when in fact that was an outlier. And it was not harmless here. For now, I will sit down, but if there is time on rebuttal, I can go through quite a long list of evidence that would demonstrate to this court that in fact the evidence against Dr. J was not overwhelming in the way the government has intimated. Thank you. Thank you, counsel. May it please the court, Stephen Archer for the United States, addressing in reverse order on the prosecutorial misconduct. The reason the government, and I was the prosecutor who gave the rebuttal statement, talked about those forms was because the defense counsel, in his closing argument, specifically picked the forms for the patient, Dolores Alejandrino. So the government's rebuttal was direct, straightforward, and narrow, responding to the defense counsel saying that in the case of, and the defense counsel, Mr. Sherman, put for the jury to see government's Exhibit 26, which was the hospice file for Dolores Alejandrino, and the defense counsel pointed to the intake form as if that was the nursing assessment. And so the rebuttal was rebuttal 101 when I got up and said the defense counsel is using that intake form and not pointing to, which is the more appropriate form, the nursing assessment form. And so then in rebuttal, I pointed out that government Exhibit 26, in the particular page 33, is the nursing assessment form for Dolores Alejandrino, and in the diagnosis section at the top of the form, it has diabetes and hypertension. Those are not terminal illnesses, and those wouldn't have qualified to be eligible for Medicare reimbursement. And then I also pointed out in rebuttal, again, limited to the patient that defense counsel, in his argument, had raised. In fact, but- So you're saying that the rebuttal was basically limited to responding to just the particular intake form for that patient that Mr. Sherman discussed during his closing and not beyond that, not as indicative of any other patients? Because what counsel is saying is that, sure, that's a fair response as to the one patient, but then to say that that's emblematic of fraud with regard to all the other ones as well, I think it's the latter part that she's objecting to. Yes, and that's why I want to focus back as to what was actually said in the record rather than what I think defense counsel has done, similar to what happened in the closing argument in the appeal brief and in the mistrial motion, is to elevate and expand and kind of spin what the government was saying. As the court pointed out, the defense counsel at ER 310 said, and what does the nurse find, and then the defense counsel is pointing to the Dolores Alejandrino intake form, and then I responded at ER 336, I'm focusing on the intake form, which defense counsel had up is not the assessment. And then I specifically talk about the nursing assessment, and that's at ER 336, starting at about lines 12. And then I also pointed to the defendant, Dr. J's health and physical form, which is exhibit 26, government excerpts of record 1311, and that for Dolores Alejandrino shows the terminal illnesses and the other information that was basically transcribed, and that's information on the intake form is transcribed from the other medical documents. And the two key medical documents here would be to look at defendant's own history and physical, which has these terminal illnesses, and contrast that, and that's what I did in the rebuttal argument, with the nursing assessment by the field nurse who went there, and that is, doesn't have the terminal illnesses that had diabetes and hypertension. Can we get to the sentencing issues, which I think are the bigger issues in this case? Yes. As far as the Rule 32, well, the sentencing issue regarding factual findings was lost, and the district court teed up what the dispute was at the outset of the hearing and said that the government had come up with a summary chart by the agent and other evidence from the trial and sentencing that the loss should be approximately over $4 million, and that loss number was adopted by the pre-sentence report in getting to an offense-level enhancement of 18, and it was clear that that was the government's position, it was adopted by the probation office, and then the district court at the outset of the hearing said that the defendant's view, and the only alternative actual number that the defendant provided for a loss was just the counts of conviction, which I think resulted in about a $45, $46,000. That was the only actual alternative loss number that the defense presented, and then the court, after hearing argument, said that the objections that the defense had made to the 18-level increase would be overruled. This is at ER 44, and the court said that the offense level is 31. The only way the court would have gotten to the offense level of 31 is by finding an offense-level enhancement for the loss of 18, so it was clear that the court had found the 18 levels, the court had cited what both parties' positions were, there was no confusion, there was no confusion at the time of the sentencing hearing that the court hadn't made the requisite factual finding in what the loss was. Defense counsel didn't ask at the hearing for any further findings as to loss. In fact, on the waiver issue, defense counsel, although making objections to the 18-level increase in the papers, by the time of the sentencing hearing, the defense counsel even said, ultimately, the government is correct, and the court has tons of discretion on the loss calculations, and this is at ER 26, and then at other portions at ER 31, the defense counsel says, essentially conceding what the loss calculation was, that there was an 18-level adjustment. And what the defense counsel focused on by the time of the hearing was the 3553 factors. And as to the basis for the government's position on the loss, the court didn't need to find every single patient, but what the government's approach was, that the hospice company was a hospice fraud factory, and that the business model was set up that it was based on referrals. The way they obtained patients was not by legitimate means where someone's primary care physician or the hospital would refer them, but basically by paying marketers. And this was set out in the government's sentencing papers, and the district judge, who's in a unique position, not only being the district judge at sentencing, but having presided over the trial, and having sentenced, in this case, there was about 10 defendants. So going back to the business model, the defendant himself was a top recruiter of over 50 percent of the patients. This is at GR 572, 563, 565. In the government's sentencing papers, it had the special agent review from the search warrant, the hospice files that were obtained, and the special agent in a declaration at 381 essentially said that review of the patient files shows an absence of medical documentation, of lab testing, of other primary care physicians or other doctors supporting the conclusion of the medical diagnosis. So those facts support the district court's finding and the government's position that all of those 130-something patients were fraudulently made. There was no effort, there was no documentation in the file to justify a finding of terminal illness. The fact that the patients essentially didn't die is a strong indication that this was just running a fraud mill to them. The government's theory is that all the patients who were certified for hospice care as being terminal were fraudulently certified, all of them. The government actually didn't take that position. I think the government took a more conservative position, although the government could have taken that position, because from the inception, if a patient is acquired by recruiting and paying a kickback, that is illegal and that taints the claim to Medicare. So the government could have taken the position that all the claims based on the evidence that the owner, Sharon Patra, who testified, and the director of nursing testified that this was their business model, could have. But the government took a more conservative approach, and that any patient who was discharged after six months and still alive and was a patient of Dr. J, so also the government limited the loss for Dr. J to only the patients for which Dr. J was the attending physician, and the defense never disputed those statistics, those facts. Those were the facts that weren't disputed, that there were 130-something patients, that Dr. J was the attending physician, that the Medicare claims data showed that, and that was the basis for the loss calculation that the government submitted to probation and probation adopted. The defense never challenged that those were not Dr. J's patients, that he was not the attending physician, that those patients weren't discharged, and that they were alive. Those were the facts that, if those were to them. That was the theory that was reflected in the summary chart. Correct, and adopted by the probation office, and ultimately yielding the 18 levels. But to get back to it, if the patient had died within six months or before being discharged, that wasn't included in the government's loss calculation. In fact, the government's loss calculation, the patient's chart, which is Exhibit B, it's the record 403, and it's actually, for patients that died, they were not included in the loss. Even though there's a basis, I think the government could have argued that they would. In my office, I have a clock, much smaller, but like that, where the battery is dead. But two times a day, it's showing the right time, but not because the clock is working. And that's the same argument here, that the fact that the patients might have died after being admitted within six months, the government sort of gave that to defense. But it's not because there was a medical judgment based on lab tests or consultations with the primary care physicians that the patient died. So the government said in its brief, it was maybe a coincidence, but those patients were not counted in the loss. Also patients where Dr. J was not the attending physician, where other defendants, like the other defendants, were tagged with a loss level that was higher, closer to the full amount of billing, the $7 million. All right. Why does this have to go back because of the ex post facto clause issue? Well, for two reasons. One, there's a waiver argument as to that. Let's assume that we can get past the waiver argument. Okay. But I do want to point out, it is in the record that it's clear that the defendant said that he was properly tagged with the two levels for more than the $1 million fraud, and he doesn't challenge these seven levels. That's at ER 30, line 22. So the defendant clearly knows about these enhancements and says, I'm not challenging these seven levels. Then for the point that Judge Owens made, one, there's no prejudice, no harm, no foul. On count nine, which isn't challenged, there's no ex post facto violation. But in addition, Ortlin specifically says that for continuing offenses, of which healthcare fraud under the Holden case in this court is a continuing offense, Ortlin says 972 at 11,112 required that all continuing offenses be sentenced under one guideline manual, the later one. So defendant should have been sentenced under the 2016 guideline, which does have the enhancement, which didn't present the ex post facto violation for all the offenses. Let me ask you this, counsel. The way the case was charged, though, let's say the defendant were acquitted of count nine. Would you still say that the 2016 guideline should apply for a count in 2011? I think the way the case was charged, and the answer is no. Well the charging should matter if, those were executions of the scheme specific counts, but it's still a continuing offense. The defendant was on... Even as charged as multiple executions of the scheme? Yes, the bank fraud under... Is probation calculated as being under two separate guidelines manual? Probation did, and the parties did not point that out, but probation specifically overlooked the statement in Ortlin that said continuing offenses should be under the later guideline manual. Probation in trying to address the ex post facto cited to Ortlin, but didn't cite to that part of Ortlin, and also probably overlooked the fact that healthcare fraud is a continuing offense. And the... Defendant was constructively on notice in committing the crimes subsequent to when the enhancement became effective. Any conduct, any relevant conduct, any conduct that was part of the scheme, defendant would be subject to be sentenced on that conduct. And defendant continued to commit conduct, even though a specific execution wasn't charged as a subsequent count, the scheme continued... Well, if we reject that argument and find that probation had properly calculated the harmless, because the sentence ultimately imposed was at the low end of count nine, but the high end of, you know, eight counts one through eight. So had the court known that most of the counts had a high end of 108, the court might have gone lower. I don't know. That would be speculating at this point, wouldn't it? Well, the court found the range actually as of... The court found the range of 108 to 135 months. Right, right. Based on an offense level of 31, but as to counts one through eight, the offense level is 29 with a range of 97 to 108. So what I'm saying is had the district court appreciated the fact that the low end of level 31 is actually the high end of the majority of the counts, the court might have selected a different sentence. Anyway, Judge Gould, do you have any questions for government counsel? No questions here, thanks. All right. Thank you very much, counsel. Yes, ma'am.  Thank you, Your Honor. I think the court has my argument on the continuing offense issue, so I won't address that unless the court would like me to. The government stood here and argued various... As to various pieces of evidence pointing to Patro's testimony, marketers, recruiters, these are facts that the government argued to the district court and that the district court had to either adopt or reject in reaching the calculation of loss that it did. Even the PSR calculated different offense levels that would have applied if the amount was reduced by 16%, 20%, or 34%, depending on the reasonable parameters that Medicare has established for death in hospice. Now, counsel, we agree with you on the ex post facto issue and think it needs to be remanded for sentencing. Doesn't that, in effect, take care of the Rule 32 issue because resentencing the district court would have to follow Rule 32 and you can make all these same arguments then? I think that's absolutely right, Your Honor. I think reversal on both grounds would be warranted. However, I will very, very briefly just explain that I think fairly read in context, I understand why the prosecution here is arguing vociferously that he did not commit misconduct. It's not a bad faith issue. We don't have to make a showing of bad faith and we never have tried to make a showing of bad faith. Nonetheless, I think fairly read in context, the jury was asked to draw an inference as to how the fraud scheme worked based on an outlier set of patient records. That wasn't fair rebuttal. There was no chance then for defense counsel to set the record straight. If you were going to argue that he went beyond just that one patient and one patient's page in the transcript where it reflects that. Yes, Your Honor. I think that that paragraph, and I'm happy to pull out exactly what page. Are you talking about ER 336 and 337? Those are the two pages. Those are the two pages. All right. So you're relying on those same two pages. I am. I am relying on those two pages. I just believe that read in context, there was a fair inference that the prosecution was saying, look at these patients, look at these nurses, look at these assessments. This is how it worked. All right. Thank you, Your Honor. Thank you very much, counsel, for both sides for your argument in this case. The matter is submitted and will be in recess until tomorrow morning. All rise. We're for this session. Stand clear.
judges: Gould, Nguyen, Owens